IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:06-CV-427-FL(3)

| | |
|---|---|
| LOIS DIGGS,<br>    Plaintiff,<br><br>        v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br>    Defendant. | **MEMORANDUM &<br>RECOMMENDATION** |

This matter is before the Court upon the parties' joint Motions for Judgment on the Pleadings **[DE's 17 & 20-21]**. The time for the parties to file any responses or replies has expired. Accordingly, the matter is now ripe for adjudication. Pursuant to 28 U.S.C. 636(b)(1), this matter is before the undersigned for the entry of a Memorandum and Recommendation. The underlying action seeks judicial review of the final decision by Defendant denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the following reasons, it is HEREBY RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings **[DE-17]** be DENIED, Defendant's Motion for Judgment on the Pleadings **[DE-20]** be GRANTED, and that the final decision by Defendant be AFFIRMED.

**Statement of the Case**

Plaintiff filed separate applications for DIB and SSI on August 15, 2003 and July 31,

1

2003, respectively (Tr. 10). In both applications she alleged that she became unable to work on December 21, 2002 . *Id.* These applications were denied at the initial and reconsideration levels of review. *Id.* A hearing was later held before an Administrative Law Judge ("ALJ"), who found Plaintiff was not disabled during the relevant time period in a decision dated May 31, 2006. *Id.* at 10-17. The Social Security Administration's Office of Hearings and Appeals denied Plaintiff's request for review, rendering the ALJ's determination as Defendant's final decision. *Id.* at 4-6. Plaintiff filed the instant action on October 18, 2006 **[DE-1]**.

## **Standard of Review**

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...
> Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the

court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

## **Analysis**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).
> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment (Tr. 12). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) episcleritis; 2) erythema nodosum; 3) multiple arthralgias; and 4) a mood disorder. *Id.* at 13. In

3

completing step three, however, the ALJ determined that these impairments were not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulation No. 4. *Id*.

The ALJ then proceeded with step four of his analysis and determined that Plaintiff retained the residual functional capacity ("RFC") to perform a limited range of medium work. *Id*. Based on this finding, the ALJ found that Plaintiff could perform her past relevant work as: 1) a general inspector; 2) production machine tender; or 3) daycare operator. *Id*. at 17. Accordingly, the ALJ determined that Plaintiff was not under a disability at any time through the date of her decision. *Id.* In making these determinations the ALJ cited substantial evidence, a summary of which now follows.

Plaintiff was treated by Dr. Michelle Wysinger on August 22, 2002 with complaints of headaches, right eye pain, nausea, vertigo and joint pain. *Id*. at 117-178. Dr. Wysinger provided Plaintiff with prescriptions for her pain and headaches. *Id*. at 178. Plaintiff was then referred to Dr. Nicholas Patrone, a rheumatologist. *Id*.

On September 6, 2002, Plaintiff was treated by Dr. Patrone. *Id*. at 175-176. Dr. Patrone noted that Plaintiff had pain in her joints. *Id*. at 175. This pain had been accompanied by three episodes of episcleritis. *Id*. An erythema nodosum lesion was noted on her left shin. *Id*. at 176. Plaintiff was treated with methylprednisolone. *Id*. During a follow-up on September 16, 2002, the lesion was resolved and Plaintiff's methylprednisolone dosage was decreased. *Id*. at 174. Plaintiff was diagnosed with erythema nodosum associated with arthralgias and scleritis. *Id*. Dr. Patrone specifically declined to make any

4

further diagnosis. *Id*.

Dr. Wysinger treated Plaintiff again on September 18, 2002. *Id*. at 173. Plaintiff complained of an earache and symptoms of vertigo, for which Dr. Wysinger prescribed meclizine. *Id*. However, Plaintiff also stated that her joints felt "much, much better." *Id*. In addition, Plaintiff's blood pressure was well controlled on medication and Dr. Wysinger ruled out autoimmune inflammatory arthropathy. *Id*.

Plaintiff was seen by Dr. Patrone on October 14, 2002. *Id*. at 172. He noted that Plaintiff had: 1) T2 tenderness of PIPs, MCPs, knees and ankles; 2) inflammation and pinkness in her right eye; 2) a blood pressure 140/90; and 3) three erythema nodosum lesions over her lower extremities. *Id*. Dr. Patrone noted that Plaintiff was doing well until her dosage of methylprednisolone was reduced to 1mg. *Id*. As a result, he increased Plaintiff's dosage of methylprednisolone. *Id*.

From October 22, 2002 through November 22, 2004, Plaintiff continued to see Dr. Wysinger and Dr. Patrone. *Id*. at 140-171. Plaintiff's treatment consisted primary of adjusting her dosage of methylprednisolone and various other medications. *Id*. On November 22, 2004, Dr. Patrone stated that "[s]ince last being seen [Plaintiff's] scleritis, erythema nodosum, and arthritis have definitely improved . . ." *Id*. at 140.

Plaintiff was also referred to an ophthalmologist. *Id*. at 165-166. From June 5, 2002 through April 31, 2003, Plaintiff was seen at the Medical Eye Associates for recurrent episcleritis. *Id*. at 116-122. Plaintiff's condition improved and she was given a prescription of Voltaren 75 mg on an as needed basis. *Id*. Later records noted that: 1) Plaintiff's scleritis

5

was quiet and resolved; 2) her vision was better; and 3) she was compliant with her eye medication. *Id.* at 198-205.

On February 13, 2003, Plaintiff was referred to Dr. Mitchell Mah'moud for an evaluation of her recurrent nausea and vomiting with abdominal pain. *Id.* at 164. Dr. Mah'moud recommended a gastric emptying study. *Id.* On February 1, 2003, Plaintiff underwent a gastric emptying study, the results of which were normal. *Id.* at 139.

Dr. Lewis Thorp reviewed Plaintiff's records and upon physical examination completed a consultative examination on October 14, 2003. *Id.* at 123-126. His impressions were: 1) polyarthritis, etiology uncertain; 2) episcleritis; 3) erythema nodosum; and 4) questionable lumbar discopathy. *Id.* at 125. He further stated that "[t]he prognosis for these problems is uncertain in that the diagnosis is not established." *Id.* Finally, he noted that there may be a component of depression in Plaintiff's symptoms. *Id.*

Plaintiff was also treated by Pro Active Therapy. *Id.* at 191-197. Here, Plaintiff's treatment included: 1) manual therapy; 2) hot/cold packs; 3) electrical stimulation; and 4) ultrasound. *Id.* She was also instructed to perform home exercises and activity of daily living exercises. *Id.* On March 18, 2004, Plaintiff's rehabilitation potential was assessed as "good." *Id.* at 197. Later, it was noted that Plaintiff was progressing, albeit "minimally" and "slowly." *Id.* at 193.

The ALJ made the following observations with regard to Plaintiff's episcleritis:

> claimant has been treated with volaren. The claimant initially presented with decreased vision bilaterally. However, with treatment, her visual acuity and her peripheral visual fields have remained within normal limits. While the

claimant has had recurrent flares of this episcleritis, these have been of limited duration and have always been responsive to medical treatment [*Id.* at 92-105, 116-122, 198-205].
*Id.* at 14.

Similarly, the ALJ stated the following with regard to Plaintiff's erythema nodosum:

This condition has been evidenced by tender lesions and nodules on her lower limbs . . . The claimant's recurrent lesions and nodules have responded to treatment with . . . medications and she has not had any complications related to this condition [*Id.* at 92-105, 123-126, 140-190, 206-211]
*Id.* at 14.

Next, the ALJ found the following with regard to Plaintiff's arthralgias:

claimant has a history of multiple arthralgias involving, variously, the shoulders, elbows, hands and fingers, hips, knees, and feet. She also has back pain . . .On examinations, the claimant has been found to have tenderness of the involved joints and of the spine. However, the claimant has not had any signs of synovitis or of joint deformity. A consultative examination . . . revealed that the claimant had limitation of motion of the lumbosacral spine and the shoulders and she had pain on motion of the left hip. However, she did not have any limitation of motion of the other joints. The claimant's neurological findings were normal with no evidence of motor weakness or muscle atrophy. An MRI of the cervical spine was performed on March 20, 2004 and this revealed minimal disc protrusion at the C6-7 level. However, . . . examination revealed that the claimant had a full range of motion of the neck with no radicular neurological deficits. A bone scan was performed on November 12, 2001 and this was normal. An x-ray of the sacroiliac joints performed in November, 2001 was also normal. No other x-rays have been performed . . .The claimant has reported having some response to various medications which have been prescribed but she has continued to complain of recurrent arthralgias and has, therefore, has been diagnosed with chronic pain syndrome [*Id.* at 92-115, 123-126, 135-197, 206-211].
*Id.* at 14.

On October 22, 2003, Dr. Charles Burkhart completed an assessment of Plaintiff's RFC. *Id.* at 127-134. Dr. Burkhart determined that Plaintiff could: 1) occasionally lift and/or carry 50 pounds; 2) frequently lift and/or carry 25 pounds; 3) stand and/or walk (with

7

normal breaks) for a total of about 6 hours in an 8-hour workday; 4) sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and 5) push and/or pull with no limitations other than those already noted for lifting and carrying. *Id.* at 128. In addition, he determined that Plaintiff could occasionally climb and frequently balance, stoop, kneel, crouch and crawl. *Id.* at 129. No manipulative, visual, or communicative limitations were noted. *Id.* at 130-131. Finally, he determined that Plaintiff should avoid hazards such as machinery and heights. *Id.* at 131.

On December 19, 2005, Dr. Anthony Carraway performed a consultative psychiatric examination of Plaintiff. *Id.* at 212-214. Plaintiff reported a moderate degree of mood symptoms secondary to her chronic pain. *Id.* at 214. She displayed mild to moderate impairment of short-term memory and no impairment of immediate memory. *Id.* Her attention and concentration were intact. *Id.* Plaintiff's ability to understand, retain, perform instructions was deemed minimally impaired. *Id.* Dr. Carraway determined that Plaintiff's intellectual level of functioning was low average. *Id.* He also noted that Plaintiff would be able to handle her funds if she were awarded benefits. *Id.*

Plaintiff testified at the hearing before the ALJ. *Id.* at 230-256. She stated that she is disabled due to constant pain in her shoulders and fingers. *Id.* at 245. Regarding her activities of daily living, Plaintiff stated that: 1) on a typical day she does not do much beyond taking her medicines and laying around all day; 2) she does not does not assist her children in getting ready for school; 3) she has difficulty bathing and styling her hair; 4) she has difficulty buttoning her shirts; 5) she is not able to write and 6) she does not do any

8

housework or shop for groceries. *Id.* at 245-250.

With regard to Plaintiff's testimony, the ALJ made the following findings:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible. The claimant's episodes of epislceritis are not frequent. Her acute episodes have always been rapidly responsive to treatment. The claimant has not suffered any loss of distant or near visual acuity or any loss of visual peripheral fields related to this condition. The claimant's episodes of lesions and nodules from erythema nodosum have also been responsive to treatment and have not been of long duration. The claimant does not have any specific functional limitations related to these episodes. The claimant does not have any significant anatomical structural deformities related to her multiple arthralgias. There have been no signs of persistent joint inflammation and there is no evidence of joint deformity. There are no focal neurological deficits. The undersigned did not observe any signs of joint swelling at the hearing. Further, the claimant has not required such aggressive measures for symptom relief as epidural or joint injections, application of TENS equipment, or enrollment in a pain management program. The treatment regimen, therefore, indicates that the claimant's symptoms are not as intractable as alleged. With regard to her mood disorder, the record reveals that the claimant has some symptoms related to chronic pain. However, she does not have any signs of a thought disorder and she does not have any vegetative symptoms of a major depressive disorder. It is noted that the claimant has not been referred for treatment by a mental health care professional for her depressive symptoms. In addition, the medical evidence and observations by the Administrative Law Judge do not reveal any evidence of a change in motor tone or bulk such as disuse atrophy, or other change in body habitus or constitutional appearance such as weight loss, which might be expected in a person whose activities are markedly restricted due to a debilitating disease process. These factors indicate that the claimant's allegations of functional restrictions are not fully credible . . . Dr. Carraway provided an examining source statement indicating that the claimant's chronic pain would have minimal impact on her ability to perform simple, routine, repetitive tasks and that her ability to tolerate stress would be mildly to moderately limited . . . *Id.* at 16.

Based on this record, the ALJ made the following findings with regard to whether Plaintiff's impairments met or medical equaled one of the listed impairments:

> There are no Listing of Impairments criteria for episcleritis or erythema nodosum. The claimant's multiple arthralgias have not resulted in major dysfunction of a joint or required reconstructive surgery as required for this condition to meet the relevant criteria of Listings 1.02 or 1.03. The claimant's mood disorder has not resulted in marked limitation in function in function in two areas are required for this condition to meet the relevant criteria of Listing 12.04A/B and there is no historical evidence indicating the presence of the "C criteria" as required to meet Listing 12.04C. The claimant's conditions are not manifested by other clinical findings indicating a level of severity comparable to the Listing criteria and, therefore, her conditions can not be found to equal the relevant Listing of Impairments.
>
> With regard to her mental condition, the Administrative Law Judge finds that the claimant has a mood disorder secondary to chronic pain and to chronic medical illness with depressive symptoms. These clinical abnormalities have resulted in moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate deficiencies in maintaining concentration, persistence, and pace. She has not had any episodes of deterioration or decompensation of extended duration. As stated above, there is no historical evidence to establish the "C criteria" as defined in Listing 12.00F.
> *Id.* at 13.

After weighing this evidence, the ALJ made the following finding with regard to Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of medium work. The claimant is able to stand and walk for up to 6 hours in an 8-hour day, to lift a maximum of 50 pounds, and to lift and carry 25 pounds frequently. Due to her chronic pain, the claimant requires a work environment which would permit her to change between sitting and standing positions at will. Her chronic pain would also limit her ability to perform tasks requiring fingering. Due to her mood disorder related to her chronic pain, she is not able to perform tasks that require meeting production goals.
> *Id.* at 13.

Given this RFC determination, the ALJ determined that Plaintiff could perform her past relevant work as: 1) a general inspector; 2) production machine tender; and 3) a day care worker. *Id.* at 17. The ALJ reached this determination by relying upon the Department of Labor's Dictionary of Occupational Titles ("DOT"). When an ALJ analyzes past relevant work as it is performed in the national economy, she is entitled to rely on the exertional categories found in the DOT. Kirkendoll v. Apfel, 162 F.3d 1155 (4th Cir. 1998)(unpublished op.)(*citing* DeLoatche v. Heckler, 715 F.2d 148, 151 (4th Cir. 1983)). In addition, the record also included the findings of an expert who completed a vocational analysis. *Id.* at 25. The vocational analysis stated that Plaintiff was not disabled. *Id.*

Based on the forgoing record, the Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. The Court first notes that this case was decided at step four of the sequential evaluation process, based upon Plaintiff's capacity to do her past relevant work (Tr. 17). If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995)(*citing* Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)). Moreover, a claimant carries the burden of proof through step four of the sequential evaluation process. *Id.* Plaintiff has failed to meet her burden of demonstrating that she cannot perform her past relevant work. Specifically, the ALJ's determination was supported by substantial evidence, as summarized above. Although Plaintiff lists two assignments of error, both assignments essentially contend that the ALJ improperly weighed the evidence before her. However, this

11

Court must uphold Defendant's factual findings if they are supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court to do, her entire claim is meritless.

## Conclusion

For the reasons discussed above, it is HEREBY RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings **[DE-17]** be DENIED, Defendant's Motion for Judgment on the Pleadings **[DE-20]** be GRANTED, and the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 4th day of October, 2007.

_____
William A. Webb
U.S. Magistrate Judge